# Exhibit 1

SCOTT WITT                                                January 30, 2020

Page 1

1            IN THE UNITED STATES DISTRICT COURT

2             FOR THE WESTERN DISTRICT OF TEXAS

3                   SAN ANTONIO DIVISION

4    ------------------------------------------------------

5    ROY C. SPEGELE, individually and
     on behalf of all others similarly situated,
6
                      Plaintiff,
7
                   vs.              Case No. 5:17-CV-967-OLG
8
     USAA LIFE INSURANCE COMPANY,
9
                      Defendant.
10   ------------------------------------------------------

11

12

13            Videotaped Deposition of SCOTT WITT

14              Thursday, January 30th, 2020

15
                        9:08 a.m.
16
                          at
17
                GASS WEBER MULLINS LLC
18                241 North Broadway
                 Milwaukee, Wisconsin
19

20
              Reported by Tammy R. O'Neal, RPR
21

22

23

24

25

SCOTT WITT                                          January 30, 2020

1                    Videotaped deposition of SCOTT WITT, a

2          witness in the above-entitled action, taken at the

3          instance of the Defendant, pursuant to the Federal

4          Rules of Civil Procedure, pursuant to notice, before

5          Tammy R. O'Neal, RPR and Notary Public, State of

6          Wisconsin, at Gass Weber Mullins LLC, 241 North

7          Broadway, Milwaukee, Wisconsin, on the 30th day of

8          January, 2020, commencing at 9:08 a.m. and concluding

9          at 1:56 p.m.

10   A P P E A R A N C E S:

11                   MILLER SCHIRGER LLC, by
                       Mr. Matthew W. Lytle
12                     4520 Main Street, Ste. 1570
                       Kansas City, MO 64111
13                     mlytle@millerschirger.com
                       Appeared on behalf of Plaintiff.
14
                     STUEVE SIEGEL HANSON, by
15                     Mr. David A. Hickey and
                       Mr. Ethan M. Lange
16                     460 Nichols Road, Ste. 200
                       Kansas City, MO 64112
17                     hickey@stuevesiegel.com
                       lange@stuevesiegel.com
18                     Appeared on behalf of Plaintiff.

19                   SIDLEY AUSTIN LLP, by
                       Mr. Eric S. Mattson and
20                     Mr. Joel S. Feldman
                       One South Dearborn
21                     Chicago, IL 60603
                       emattson@sidley.com
22                     jfeldman@sidley.com
                       Appeared on behalf of Defendant.
23
     Also Present:   Jay Church, Videographer
24

25

SCOTT WITT                                          January 30, 2020

Page 50

```
 1          circumstances, and it is shown at five different
 2          points in time, the original UL3 mortality, the
 3          repriced UL3 mortality, the 2001 mortality that's
 4          associated with the development of the UL4, the 2005
 5          mortality which is the repricing of the UL4, and then
 6          the 2017 mortality is a recent -- based on a recent
 7          mortality study.  And in the final column shows the
 8          percentage improvement from the original pricing to
 9          the latest 2017 mortality.
10     Q    How many pricing cells are reflected on this chart?
11     A    One.
12     Q    Mr. Spegele's?
13     A    Yes.
14     Q    Did you analyze whether mortality improved over time
15          in every pricing cell every time USAA life evaluated
16          mortality?
17     A    Not rigorously.
18     Q    You know there's a question that's going to come
19          after that response.  When you say not rigorously,
20          what does that mean you did do?
21     A    I -- there were numerous studies in that interval,
22          and I picked the latest one really you could say as a
23          placeholder, just as a demonstration of the count
24          three theory, as I understand it from Plaintiffs,
25          that there were additional improvements in the
```

SCOTT WITT                                    January 30, 2020

1        expected mortality.

2                    And so I recall looking at others, but I

3        was only picking one for the demonstration here, so I

4        can't speak to the, you know, year-by-year,

5        cell-by-cell trend other than to say that it

6        generally -- based on a high-level overview, it

7        generally appeared to be improving over time.

8    Q   But that was -- tell me if this is fair -- that was

9        more impressionistic as opposed to doing some sort of

10       data analysis to see if that was true for every cell

11       at every reevaluation of mortality?

12   A   That's fair to say.

13   Q   Did you in your analysis consider how policy beholder

14       -- strike that.

15                   Did your analysis consider how policyholder

16       behavior would have changed had the cost of insurance

17       rates been lower than they were?

18   A   No.

19   Q   What can a policyholder do in a universal life policy

20       to either continue with the policy or have greater

21       investment in the policy or lesser investment in the

22       policy?  Explain what their options are when they're

23       in the middle of owning a universal life policy.

24                   MR. LYTLE:  Object to the form.

25                   THE WITNESS:  They often have premium

SCOTT WITT                                          January 30, 2020

Page 55

```
 1   BY MR. MATTSON:

 2   Q    Throughout the life of the policy?

 3   A    Yes.  I only took one to -- right, if you could -- as

 4        soon as I saw an instance where the COI was higher

 5        than the expected mortality, that said to me that

 6        under Plaintiff's theory, there would be damages.

 7   Q    And that's a distinct exercise, isn't it, from

 8        looking to see if overall, if you just kind of net

 9        out any situations where the COI rate is over or

10        under expected mortality as you're using those terms,

11        yields a net positive or a net negative?

12   A    Yeah, it's a different exercise.

13   Q    Okay.  Did you perform the exercise that I just tried

14        to describe, trying to figure out whether on a net

15        basis somebody was better off or worse off with the

16        COI scales that Plaintiffs are proposing here?

17                  MR. LYTLE:  Object to the form.

18                  THE WITNESS:  I know with -- I know with

19        certainty that Plaintiffs would be better off with

20        the proposed scale because my understanding of

21        Plaintiff's theory is that the goal is to strip out

22        the excess.  So the COI rates will be capped at the

23        COI rate, the --

24   BY MR. MATTSON:

25   Q    At the mortality rate?
```

SCOTT WITT                                          January 30, 2020

Page 56

```
 1   A    No, the rate that would be used in my calculation is

 2        really the lesser of the expected mortality rate or

 3        the actually charged COI rate, because my

 4        understanding of Plaintiff's theory is that the

 5        breach was any charge that was in excess of expected

 6        mortality.  There's no contractual -- my

 7        understanding, there's no contractual prohibition of

 8        the company charging less than expected mortality.

 9             So my exercise is to -- the exercise that I

10        went through, what I believed my charge to be, was

11        that I was to remove the excess from the COI to the

12        extent that that excess was a non-mortality

13        component.

14   Q    Are you familiar with the phrase, Heads, I win;

15        tails, you lose?

16   A    I am.

17   Q    Isn't that kind of what Plaintiff is proposing here?

18             MR. LYTLE:  Object to the form.

19             THE WITNESS:  I don't think so.  Again,

20        Plaintiff's theory as I understand it is that the

21        alleged wrongdoing comes anytime that a charge is

22        levied that is greater than the expected mortality.

23        So it's not a straight substitution as much as it is

24        an elimination of the excess of that COI charge.

25   BY MR. MATTSON:
```

SCOTT WITT                                     January 30, 2020

Page 64

 1        count five as well about declaratory and injunctive

 2        relief; is that --

 3   A    Yes.

 4   Q    -- consistent with your recollection?

 5   A    Yes.

 6   Q    All right.  So I'm just focusing on the three

 7        different theories of why Plaintiff says USAA Life

 8        did not abide by the contract, okay?

 9   A    Okay.

10   Q    And you show total damages here of $2,190.84, yes?

11   A    Yes.

12   Q    Is that showing damages for the count one theory, the

13        count two theory, or the count three theory or some

14        combination?

15                  MR. LYTLE:  Object to the form.

16                  THE WITNESS:  The count one theory.  Also

17        my understanding is that that's also the count two

18        damages, and then count three is not addressed by

19        this spreadsheet.

20   BY MR. MATTSON:

21   Q    Is there a dollar figure that you calculated for

22        count three damages anywhere in Exhibit 1 or the

23        exhibits to it?

24   A    Can I look at my --

25   Q    Of course.

SCOTT WITT                                          January 30, 2020

                                                        Page 65

```
 1   A    No, the only thing I put in my report was a

 2        demonstration of one particular policy year for

 3        Mr. Spegele.  His 28th policy year I calculated what

 4        the overcharge percentage would be in that one

 5        particular year, and that overcharge percentage is

 6        above and beyond what would have been calculated in

 7        count one such that there is no overlap between count

 8        one and then count three damages.  The count three

 9        damages are above and beyond the count one with no

10        overlap.

11   Q    Okay.  Let's go back to Exhibit 2.  First why don't

12        you tell me what your understanding is of what

13        qualifies as count one damages.

14                  MR. LYTLE:  Object to the form.

15                  THE WITNESS:  Can I refer to my report on

16        that?

17   BY MR. MATTSON:

18   Q    Yes, of course.

19   A    I believe I took the time to spell out those

20        different counts.

21   Q    Are you looking at paragraph 13 by chance?

22   A    I am, yes.  And I'm just getting ready to restate

23        that.

24   Q    Yes.

25   A    So my understanding is that count one, Plaintiff's
```

SCOTT WITT                                    January 30, 2020

Page 70

```
 1                      And from that limited data I attempted to
 2          extrapolate various elements that would allow me to
 3          calculate the damages as shown here.
 4     Q    Turning to count two -- and feel free to look back at
 5          your report.  I think it's paragraph 14 -- can you
 6          describe what count two damages are in this case?
 7     A    My understanding is that Plaintiff's theory is that
 8          USAA should have been limited to charging only the
 9          expenses that were stated in the policy based on the
10          contractual language.  I believe in the first year
11          there was an administrative charge, and then in all
12          years including first year, there was a maintenance
13          charge.
14                      My understanding is that the calculation
15          that I have performed here takes the viewpoint that
16          any charge in the COI rate that's above and beyond
17          the expected mortality is viewed as an expense, and
18          as such the count two damages would be identical to
19          count one.
20     Q    Is -- do you consider profit to be an expense?
21     A    It could be from the policyholder's viewpoint.
22     Q    Is it?  That doesn't sound natural to me.  Does that
23          sound right to you?
24                      MR. LYTLE:  Object to the form.
25     BY MR. MATTSON:
```

SCOTT WITT                                       January 30, 2020

Page 71

1   Q    That the profit is an expense?

2                 MR. LYTLE:  Same objection.

3                 THE WITNESS:  I -- I was engaged to

4         calculate damages based on Plaintiff's theory.  I

5         wasn't engaged to come up with their theories.

6   BY MR. MATTSON:

7   Q    When you were at Northwestern Mutual, didn't you

8         distinguish between profit and expense?

9                 MR. LYTLE:  Object to the form.

10                THE WITNESS:  I don't recall there being

11        separately identifiable profit components of COI

12        charges.

13  BY MR. MATTSON:

14  Q    That's not my question.  As an actuary when -- well,

15        let's go back to a concept you mentioned before,

16        expense units.

17  A    Yes.

18  Q    Remember our discussion about that?

19  A    I do.

20  Q    When you were working on expense units at

21        Northwestern Mutual, was profit part of an expense

22        unit?

23  A    Not to my recollection.

24  Q    When insurance companies talk about their expenses,

25        they talk about things like paying the light bill,

SCOTT WITT                                    January 30, 2020

Page 72

```
 1        paying their employees, paying for information
 2        technology, things that they have to come out of
 3        pocket to pay for, right?
 4                   MR. LYTLE:  Object to the form.
 5                   THE WITNESS:  That sounds right.
 6   BY MR. MATTSON:
 7   Q    And when they talk about profit, that's how much
 8        money is left over after all expenses are paid,
 9        right?
10                   MR. LYTLE:  Object to the form.
11                   THE WITNESS:  Sounds right.
12   BY MR. MATTSON:
13   Q    So in count two when we're talking about expenses,
14        we're not talking about profit, are we?
15                   MR. LYTLE:  Object to the form.
16                   THE WITNESS:  Well, I think I described in
17        my report, if I am directed to handle that
18        differently, the model is capable of calculating
19        different count two damages.
20                   From the policyholder perspective, my
21        understanding is that Plaintiff's theory is that all
22        of the extras that are dumped into the COI rate are
23        viewed as an expense.  It's an amount above and
24        beyond that the contract allowed USAA to charge the
25        policyholder.
```

SCOTT WITT                                          January 30, 2020

Page 73

```
 1                     If information comes to light that allows
 2          me to partition that amount between -- or if I'm
 3          directed on how to partition that amount between
 4          expenses and profit, the model is capable of doing
 5          that.  But as it stands right now, based on the
 6          information that's available, the count two damages
 7          would equal the count one damages.
 8   BY MR. MATTSON:
 9   Q     What's your understanding, Mr. Witt, of what things
10          USAA Life considered when setting its cost of
11          insurance rates for the UL3 and the UL4?
12                     MR. LYTLE:  Object to the form.
13                     THE WITNESS:  My understanding would come
14          from the documents that I reviewed and the
15          depositions -- transcripts of the depositions.  My
16          recollection is that many things went into the
17          development of the COIs.
18   BY MR. MATTSON:
19   Q     One of those things was expected mortality, correct?
20   A     I mean -- I think it's fair to say that everything
21          goes into -- every assumption, every material
22          assumption is considered in a typical pricing
23          exercise.
24   Q     And one of those assumptions in the case of USAA Life
25          and the UL3 and UL4 policies was expected mortality,
```

SCOTT WITT                                              January 30, 2020

Page 77

```
 1   Q    I may be halfway there in understanding you, but I'm
 2        not all the way there, so let me try to get all the
 3        way there.
 4               So if you look at Exhibit 2, I had
 5        understood that the column labeled Monthly Pricing
 6        Mortality reflects your understanding of what USAA
 7        Life's understanding was at any given moment about
 8        expected mortality?
 9   A    Yes, but I limited that to the four distinct points
10        in time at which a new COI scale was developed,
11        thinking that those were -- those were particular
12        points in time that USAA took action and had a -- had
13        an expected mortality assumption.  And so the
14        original UL3 pricing, the UL3 repricing, the UL4
15        pricing, the UL4 repricing, those are the only four
16        sources of mortality that are shown in Exhibit 2.
17               And that includes all the way down into the
18        final -- the policy year 28.  I did not switch to the
19        2017 mortality in this exhibit.  I stayed with the
20        UL2 -- UL4, sorry -- I stayed with the UL4 repricing
21        mortality.
22               So if I were then to come in and calculate
23        Exhibit 3, it would -- I would be looking at the
24        improvement --
25   Q    I'm sorry, calculate damages for count three?
```

SCOTT WITT                                          January 30, 2020

 1   A   Sorry, for count three, I would be comparing the UL4

 2       repricing mortality with whatever I was using to

 3       represent the count three mortality.  And for the

 4       purposes of this report, I have used the 2017

 5       mortality as a placeholder.

 6   Q   Why is that a placeholder?

 7   A   There are many mortality tables that were -- and

 8       studies that were done between -- is it 2005?  Let me

 9       see here.  I'm just looking for when the UL4 was

10       repriced.  Looks like it was 2005.

11           So there are a number of mortality studies

12       between 2005 and 2017.  I made no effort to ascertain

13       how those improvements might be reflected in count

14       three.  I -- my instructions were to demonstrate that

15       a count three -- my model could handle a count three

16       methodology for whatever those assumptions would be.

17           And in my mind it remains an open question

18       how exactly the expected mortality improvement would

19       be defined in that period of 2005 and onward.

20   Q   Would this count three methodology you're describing

21       change any of the analysis for pre 2005 -- the pre

22       2005 time frame?

23   A   No, and in fact it wouldn't change post 2005 for

24       count one.

25   Q   I'm just talking about count three.

SCOTT WITT                                          January 30, 2020

Page 80

1          of any reason why there would be any count three

2          damages prior to 2005.  That would all be

3          encapsulated in the count one damages.

4     BY MR. MATTSON:

5     Q    Okay.  And then what you do is look at from 2005 on

6          what evidence there is at USAA Life about changes in

7          mortality expectations?

8     A    Yes.

9     Q    Can we look anywhere in Exhibit 1, including its

10         exhibits, and find which documents, which USAA Life

11         documents you would be relying on to perform that

12         calculation?

13                   MR. LYTLE:  Object to the form.

14                   THE WITNESS:  I believe they're listed in

15         there.  I would be hard pressed to point to them on

16         the fly.  I mean I can -- I can get there by

17         following the trail in my report.  But I can't off

18         the top of my head tell you which exhibit or what

19         Bates number they are.

20    BY MR. MATTSON:

21    Q    In other words there's nothing in Exhibit 1 that says

22         separately, here are the documents I would look at

23         for count three in performing the calculations that

24         you've just been describing these last several

25         minutes?

SCOTT WITT                                          January 30, 2020

1                    MR. LYTLE:  Object to the form.

2                    THE WITNESS:  I guess I view it as two

3         distinct -- two distinct issues.  There's the model

4         and understanding how the model works and how the

5         count three formula is distinct from the count one.

6         And then a separate question is what mortality

7         assumptions do you put into the model in calculating

8         those count three damages.  I don't know which you're

9         asking me.

10   BY MR. MATTSON:

11   Q    I'm asking you about the second one.  And really to

12        try to state it more plainly, can you point me in

13        Exhibit 1 to where I would see the mortality

14        expectations you would -- you would plug into your

15        count three analysis?

16   A    Okay, I'm -- I -- in paragraph 73 I describe how for

17        Mr. Spegele's 28th policy year I'm comparing the

18        mortality that was assumed in 2005 when the repricing

19        was done with the expected mortality using the 2017

20        mortality assumption.

21                   So my recollection is that the 2017

22        mortality assumption came from a USAA-supplied

23        document that had a mortality study.  And there were

24        other such studies in the intervening years between

25        1995 -- I'm sorry, between -- strike that -- between

SCOTT WITT                                        January 30, 2020

Page 82

1      2005 and 2017.

2                 I made no effort at this time to -- to go

3      beyond what I just did here.  And I looked at the

4      most recent.  Seemed clear that there had been

5      substantial mortality improvement.  I'll leave it at

6      that.

7   Q  So I think I understand.  In paragraph 73 of

8      Exhibit 1 you refer to the 2017 mortality

9      assumptions, right?

10  A  Yes.

11  Q  But I wouldn't find in Exhibit 1, and here's my list

12     of pre 2017, post 2005 mortality assumptions that I

13     would rely on in conducting this count three

14     analysis; is that fair?

15  A  I believe that they are listed in the litany of

16     documents that were reviewed and provided, but I

17     don't have -- I don't have a written, you know, step

18     by step these are the mortality studies that I'm

19     going to look at.

20  Q  Right.

21  A  In my mind everything is fair game that USAA has

22     provided related to this case, related to expected

23     mortality assumptions between the time period 2005

24     and 2017.

25  Q  And I think we're on the same page, but let me just

SCOTT WITT                                          January 30, 2020

Page 83

1        be sure.  There's nothing in Exhibit 1 that calls --

2        specifically calls out which documents you would look

3        at for that 2005 to 2017 time frame, which documents

4        would inform your understanding of the then-current

5        mortality expectations?

6   A    I think that's fair to say.  If I am charged to do

7        so, I will look at all of those documents and -- and

8        this is where some actuarial judgment may come in --

9        and formulate an appropriate assumption.

10                  MR. MATTSON:  Okay.  Let's take a short

11       break.

12                  THE VIDEOGRAPHER:  We're going off the

13       record at 11:24 a.m.  This will be the end of media

14       unit number two.

15                  (Recess taken from 11:24 to 11:37 a.m.)

16                  THE VIDEOGRAPHER:  We're back on record at

17       11:37 a.m.  This will be the beginning of media unit

18       number three.

19   BY MR. MATTSON:

20   Q    Mr. Witt, when you were at Northwestern Mutual, did

21       you ever work on a policy that was designed to lose

22       money from day one and never make money?

23   A    No.

24   Q    Would doing that be permissible under the actuarial

25       standards of practice?

SCOTT WITT                                          January 30, 2020

1      future mortality, right?

2   A   Correct.

3   Q   And then time goes on and some people continue

4       living, some people die, and you can look back and

5       see how close your assumptions were to what actually

6       turned out to happen, right?

7   A   Correct.

8   Q   And all I'm suggesting is that those two things are

9       almost always going to be at least somewhat

10      different?

11  A   Agreed.

12              MR. LYTLE:  Object to the form.

13              THE WITNESS:  I would agree with that.

14  BY MR. MATTSON:

15  Q   When you look at what Plaintiff's theory is for count

16      one, is it your understanding that Plaintiff's view

17      is that for the cost of insurance rate to be based on

18      mortality, it must be set to precisely mirror the

19      company's expectations as to future mortality?

20              MR. LYTLE:  Object to the form.

21              THE WITNESS:  That's my understanding of

22      their interpretation.

23  BY MR. MATTSON:

24  Q   Would it be your view that a rate -- strike that.

25              Is it prudent as an actuary to build in

U.S. Legal Support, Inc.
(312) 236-8352

```
 1        one -- you'll recall this morning we talked about
 2        whether you had analyzed whether mortality had
 3        improved continuously over time for every cell
 4        potentially implicated in this case.  And I think you
 5        said, and I'll paraphrase -- you said whatever you
 6        said -- that you had looked at some of those things
 7        at a high level but hadn't done sort of a
 8        cell-by-cell analysis.
 9    A   That's fair to say.
10    Q   So what I want to do is walk through one example with
11        you of where it appears to us that mortality worsened
12        for a particular cell over time.
13    A   Okay.
14    Q   And really just for the purpose of making sure that
15        you agree that that is in fact what happened for that
16        particular cell, okay?
17    A   Okay.
18    Q   All right.  So first if you will look at the tab on
19        your spreadsheet for 1987 UL pricing.
20    A   Could it be 1987 mort?
21    Q   I think it's called 1987 mort, yes.
22    A   Okay.  I'm there.
23    Q   And if you will then look at row 314, column I.
24    A   Okay.
25    Q   And you can -- can you tell me what the mortality
```

SCOTT WITT                                                  January 30, 2020

```
 1         ex -- expected mortality as you understand it is for

 2         that particular cell.

 3    A    14.04.

 4    Q    And who does that cell apply to, who -- not what

 5         person, but what demographic?

 6    A    Looks like that is a female smoker, age -- well,

 7         issued at 65 and in their sixth policy duration.

 8    Q    And the number there, the relevant number of

 9         mortality expectation is 14.04?

10    A    Correct.

11    Q    So we're going to look at two more cells with

12         different mortality expectations, and I guess I want

13         you to confirm that, A, it's apples to apples,

14         meaning it's the same demographic characteristics;

15         and B, that at least at some point the expected

16         mortality for that set of demographics worsened.

17    A    Okay.

18    Q    Does that make sense?

19    A    It does.

20    Q    Okay.  So the next one to look at is the 1994

21         repricing which I believe on your spreadsheet is the

22         1994 mort.

23    A    Okay.

24    Q    And if you look there at -- I think it's the same row

25         and same column, row 314, column I, let me know what
```

SCOTT WITT                                    January 30, 2020

Page 110

1         you see there.

2    A    If I'm in the right spot, 10.9161.

3    Q    Okay.  So in that comparison, mortality actually got

4         better if I'm understanding how these numbers work?

5    A    I agree.

6    Q    Okay.  And then if we look in the 2017 mort tab,

7         again row 314, column I, what's the mortality at that

8         point?

9    A    22.8.

10   Q    So a significant worsening of mortality?

11   A    Correct.

12   Q    Okay.  So back to my original point, for this

13        particular -- well, first of all, each of the three

14        cells that we looked at is for the same demographic

15        cohort, right; in other words, these are --

16   A    The same cell, if you will?

17   Q    Yes.

18   A    Yes.

19   Q    Yes, okay.  So same cell, different times, and what

20        we saw was the mortality for the people covered by

21        that cell got somewhat better and then got

22        significantly worse?

23   A    Agreed.

24   Q    And the ultimate mortality expectation that we see in

25        2017 is significantly worse than it was at inception?

SCOTT WITT                                          January 30, 2020

Page 111

1   A    Inception was 14 point something, is that --

2   Q    Yes, 14.04.

3   A    I agree.  And I do recall documentation talking about

4        smoker rates worsening over time.  So I think when I

5        answered before it was a broad overall mortality

6        improvement.  I may have misspoken.  I -- I am not

7        under the impression that literally every single cell

8        had improvement across the board.

9   Q    Okay.  Understood.  And just to be clear, the example

10       we just went through for the last few minutes is one

11       example of in this case mortality getting somewhat

12       better and then getting significantly worse, even

13       worse than it was at inception?

14  A    Agreed.

15  Q    When USAA Life repriced in 1994, it lowered the cost

16       of insurance rates for many insureds; is that fair?

17                  MR. LYTLE:  Object to the form.

18                  THE WITNESS:  That's my recollection,

19       although my focus was on Mr. Spegele's policy.

20  BY MR. MATTSON:

21  Q    Did -- when USAA Life did a repricing of the UL3 in

22       1994, Mr. Spegele's cost of insurance rates were

23       lowered, weren't they?

24  A    I don't know if they were immediately.  I think his

25       scale was lowered, and then once he reached a certain

SCOTT WITT                                                    January 30, 2020

                                                                Page 132
 1          STATE OF WISCONSIN )
                               ) SS:
 2          MILWAUKEE COUNTY   )

 3

 4                    I, Tammy R. O'Neal, RPR and Notary

 5          Public in and for the State of Wisconsin, do hereby

 6          certify that the preceding deposition was recorded by

 7          me and reduced to writing under my personal

 8          direction.

 9                    I further certify that said deposition was

10          taken at Gass Weber Mullins LLC, 241 North Broadway,

11          Milwaukee, Wisconsin, on the 30th day of January,

12          2020, commencing at 9:08 a.m. and concluding at 1:56

13          p.m.

14                    I further certify that I am not a relative

15          or employee or attorney or counsel of any of the

16          parties, or a relative or employee of such attorney

17          or counsel, or financially interested directly or

18          indirectly in this action.

19                    In witness whereof, I have hereunto set my

20          hand and affixed my seal of office on this 3rd day of

21          February, 2020.

22

23          _____

24          TAMMY R. O'NEAL, RPR
            Notary Public

25  My commission expires 8/2/23.