# Exhibit 4

Page 1

1             IN THE UNITED STATES DISTRICT COURT

2             FOR THE WESTERN DISTRICT OF TEXAS

3                    SAN ANTONIO DIVISION

4  --------------------------------------------------

5  ROY C. SPEGELE, individually and
   on behalf of all others similarly situated,
6
              Plaintiff,
7
         vs.            Case No. 5:17-CV-967-OLG
8
   USAA LIFE INSURANCE COMPANY,
9
              Defendant.
10
   --------------------------------------------------
11

12

13          Videotaped Deposition of SCOTT WITT

14             Thursday, January 30th, 2020

15
                       9:08 a.m.
16
                         at
17
              GASS WEBER MULLINS LLC
18                241 North Broadway
               Milwaukee, Wisconsin
19

20
            Reported by Tammy R. O'Neal, RPR
21

22

23

24

25

Page 48

1  A   Okay.

2  Q   Does that sound reasonable?

3  A   It does.  I don't know -- I mean the death benefit

4      option may or may not be -- may or may not be

5      relevant to the exercise we're doing here but ...

6  Q   Okay.  But you would acknowledge that in any event

7      there were hundreds of pricing cells at issue in the

8      UL3 policy?

9          MR. LYTLE:  Object to the form.

10         THE WITNESS:  I think some of this is just

11     semantics.  I acknowledge that there are that many

12     combinations possible.  I don't know whether USAA --

13     what they did with that, if they priced it at every

14     single -- you know, with what granularity they

15     priced.

16 BY MR. MATTSON:

17 Q   Okay.  Would you agree that for the UL4 there are

18     more pricing cells than there were for the UL3?

19 A   Yes.

20 Q   And if I suggested to you that for pricing cells for

21     the UL4 there was a grand total of 1,360.  Does that

22     strike you as the right order of magnitude?

23         MR. LYTLE:  Object to the form.

24         THE WITNESS:  It does.  It might -- it

25     might be off by a factor of two if we don't -- if we

1    don't view the two different death benefit options as
2    different pricing exercises.
3    BY MR. MATTSON:
4  Q  Okay.  Let's take a look at paragraph 72 of
5    Exhibit 1.  Strike that.
6         Take a look at page 43 of Exhibit 1.
7  A  Okay.
8  Q  Now, Mr. Spegele had a UL3 policy; is that right?
9  A  Yes.
10 Q  And what is the chart depicting at the top of page 43
11    of Exhibit 1?
12 A  The chart shows a year-by-year comparison of the
13    expected mortality as defined by the USAA documents
14    as compared with the COI rates that were actually
15    levied.  And then the final column is an overcharge
16    percentage which measures what percentage of the COI
17    rate was in excess of the prior column, the expected
18    mortality.
19 Q  How many pricing cells are reflected in this chart?
20 A  One.
21 Q  And then if you look at the chart on page 33.
22 A  Yes.
23 Q  What is this chart depicting?
24 A  This is a year-by-year depiction of expected
25    mortality for a person in Mr. Spegele's

Page 55

1   BY MR. MATTSON:
2   Q    Throughout the life of the policy?
3   A    Yes.  I only took one to -- right, if you could -- as
4        soon as I saw an instance where the COI was higher
5        than the expected mortality, that said to me that
6        under Plaintiff's theory, there would be damages.
7   Q    And that's a distinct exercise, isn't it, from
8        looking to see if overall, if you just kind of net
9        out any situations where the COI rate is over or
10       under expected mortality as you're using those terms,
11       yields a net positive or a net negative?
12  A    Yeah, it's a different exercise.
13  Q    Okay.  Did you perform the exercise that I just tried
14       to describe, trying to figure out whether on a net
15       basis somebody was better off or worse off with the
16       COI scales that Plaintiffs are proposing here?
17            MR. LYTLE:  Object to the form.
18            THE WITNESS:  I know with -- I know with
19       certainty that Plaintiffs would be better off with
20       the proposed scale because my understanding of
21       Plaintiff's theory is that the goal is to strip out
22       the excess.  So the COI rates will be capped at the
23       COI rate, the --
24  BY MR. MATTSON:
25  Q    At the mortality rate?

1  A   No, the rate that would be used in my calculation is
2      really the lesser of the expected mortality rate or
3      the actually charged COI rate, because my
4      understanding of Plaintiff's theory is that the
5      breach was any charge that was in excess of expected
6      mortality.  There's no contractual -- my
7      understanding, there's no contractual prohibition of
8      the company charging less than expected mortality.
9            So my exercise is to -- the exercise that I
10     went through, what I believed my charge to be, was
11     that I was to remove the excess from the COI to the
12     extent that that excess was a non-mortality
13     component.
14 Q   Are you familiar with the phrase, Heads, I win;
15     tails, you lose?
16 A   I am.
17 Q   Isn't that kind of what Plaintiff is proposing here?
18          MR. LYTLE:  Object to the form.
19          THE WITNESS:  I don't think so.  Again,
20     Plaintiff's theory as I understand it is that the
21     alleged wrongdoing comes anytime that a charge is
22     levied that is greater than the expected mortality.
23     So it's not a straight substitution as much as it is
24     an elimination of the excess of that COI charge.
25 BY MR. MATTSON:

Page 57

1  Q   Well, let me ask this.  If hypothetically, USAA Life
2      had from day one of these policies used the cost of
3      insurance rates that Plaintiff says should have been
4      used, if that had happened and we were trying to put
5      Plaintiffs in the situation where that is what had
6      happened, you would in fact net out situations where
7      the COI rate that was actually charged was lower than
8      expected mortality?
9          MR. LYTLE:  Object to the form.
10         THE WITNESS:  I'm not an attorney.  I can
11     just tell you my understanding of what I was asked to
12     do.  And my understanding is it is not a straight
13     substitution.  My understanding is that Plaintiff's
14     position is that USAA is free to charge less than the
15     expected mortality if they wish, but they are
16     contractually prohibited from charging more.  What
17     I'm quantifying are the instances where they charged
18     more.
19 BY MR. MATTSON:
20 Q   And let me be clear.  I'm not asking you to offer
21     opinions on legal issues.  That is the job of the
22     lawyers, and I'm sure we'll be debating this and
23     other issues in the months to come.  What I'm asking
24     you is more of a mathematical question.  And that
25     question is let's assume that from day one of UL3 and

Page 62

1    the model easily incorporates that.  It's just the
2    removal of a few lines of logic within the
3    spreadsheet.
4  Q  Have you calculated class-wide damages for this case?
5  A  No.
6  Q  For how many class members or -- strike that.
7       For how many people have you calculated a
8    damages figure?
9  A  Only one to my recollection.
10 Q  Mr. Spegele?
11 A  Yes.
12 Q  Can you mark this as Exhibit 2.
13      (Exhibit 2 marked for identification.)
14 BY MR. MATTSON:
15 Q  You've been handed Exhibit 2, Mr. Witt, which is a
16    printout from I think it's called Exhibit A to your
17    report which is the spreadsheet with a number of
18    tabs.  This is a printout of one of those tabs called
19    Spegele Damages.  You've seen this document before I
20    gather?
21 A  Yes.
22 Q  You created this document?
23 A  Yes.
24 Q  By the way, did you have anybody assist you with the
25    creation of your report for this case?

1    benefit of policy owners when its expectations as to
2    future mortality experience improved.
3  A  Correct.
4  Q  So I'd like to understand -- well, first, nothing on
5    Exhibit 2 or anywhere in your report tells me a
6    dollar amount that Mr. Spegele incurred on account of
7    count three damages, correct?
8  A  That's correct. You could approximate it by taking
9    the percentage I calculated and multiplying it by the
10   annual COI charge that's here in that 28th policy
11   year.
12 Q  So I think I heard you say before, but please correct
13   me if I'm wrong, that count three damages as you
14   understand it would be damages over and above count
15   one damages?
16 A  Correct.
17 Q  How so?
18 A  As I've outlined in Exhibit 1, the overcharge
19   percentage that is calculated for count three is done
20   in such a manner that it only -- it carves out the
21   improvement that occurred from the most recent
22   pricing mortality that I did include in count one.
23       So it really is just isolating the
24   improvement between the end of count one and going
25   forward.

Page 79

1  A   Okay. I'm sorry, could you restate it then?
2  Q   Yeah, so -- just sticking with count three, would the
3      approach you're describing change any of the what is
4      now count one analysis pre 2005?
5  A   I thought I just answered that, and you said not to
6      answer count one.
7  Q   Let me try it again. So as I understand it, the
8      difference between -- the reason count three would
9      result in damages on top of the count one damages is
10     that instead of just limiting yourself to looking at
11     what you understand USAA Life's cost -- mortality
12     expectations to be at repricing, you're looking at
13     interim periods when there's some evidence of their
14     mortality expectations having changed in some way,
15     shape, or form.
16         Am I more or less right about that?
17 A   Changes that occurred after the 2005 repricing.
18 Q   Right. And that's what I'm saying is if you're
19     looking at count three damages, would there be any
20     count three damages under the approach you're
21     describing for pre 2005 -- the pre 2005 time frame?
22         MR. LYTLE: Object to the form.
23         THE WITNESS: Well, subject to the caveat
24     that I haven't actually done this calculation for
25     Mr. Spegele let alone the entire class, I can't think

Page 80

1   of any reason why there would be any count three
2   damages prior to 2005.  That would all be
3   encapsulated in the count one damages.
4   BY MR. MATTSON:
5   Q   Okay.  And then what you do is look at from 2005 on
6       what evidence there is at USAA Life about changes in
7       mortality expectations?
8   A   Yes.
9   Q   Can we look anywhere in Exhibit 1, including its
10      exhibits, and find which documents, which USAA Life
11      documents you would be relying on to perform that
12      calculation?
13          MR. LYTLE:  Object to the form.
14          THE WITNESS:  I believe they're listed in
15      there.  I would be hard pressed to point to them on
16      the fly.  I mean I can -- I can get there by
17      following the trail in my report.  But I can't off
18      the top of my head tell you which exhibit or what
19      Bates number they are.
20  BY MR. MATTSON:
21  Q   In other words there's nothing in Exhibit 1 that says
22      separately, here are the documents I would look at
23      for count three in performing the calculations that
24      you've just been describing these last several
25      minutes?

1  STATE OF WISCONSIN )
                      ) SS:
2  MILWAUKEE COUNTY   )

3

4          I, Tammy R. O'Neal, RPR and Notary

5  Public in and for the State of Wisconsin, do hereby

6  certify that the preceding deposition was recorded by

7  me and reduced to writing under my personal

8  direction.

9          I further certify that said deposition was

10 taken at Gass Weber Mullins LLC, 241 North Broadway,

11 Milwaukee, Wisconsin, on the 30th day of January,

12 2020, commencing at 9:08 a.m. and concluding at 1:56

13 p.m.

14         I further certify that I am not a relative

15 or employee or attorney or counsel of any of the

16 parties, or a relative or employee of such attorney

17 or counsel, or financially interested directly or

18 indirectly in this action.

19         In witness whereof, I have hereunto set my

20 hand and affixed my seal of office on this 3rd day of

21 February, 2020.

22

23         _____
           TAMMY R. O'NEAL, RPR
24         Notary Public

25 My commission expires 8/2/23.