# Exhibit 1

```
 1            IN THE UNITED STATES DISTRICT COURT

 2              FOR THE WESTERN DISTRICT OF TEXAS

 3                    SAN ANTONIO DIVISION

 4    ----------------------------------------------------

 5    ROY C. SPEGELE, individually and
      on behalf of all others similarly situated,
 6
                    Plaintiff,
 7
                       vs.            Case No. 5:17-CV-967-OLG
 8
      USAA LIFE INSURANCE COMPANY,
 9
                    Defendant.
10
      ----------------------------------------------------
11

12

13           Videotaped Deposition of SCOTT WITT

14              Thursday, January 30th, 2020

15
                          9:08 a.m.
16
                            at
17
                    GASS WEBER MULLINS LLC
18                    241 North Broadway
                      Milwaukee, Wisconsin
19

20
                Reported by Tammy R. O'Neal, RPR
21

22

23

24

25
```

 1                  And from that limited data I attempted to
 2        extrapolate various elements that would allow me to
 3        calculate the damages as shown here.
 4    Q   Turning to count two -- and feel free to look back at
 5        your report.  I think it's paragraph 14 -- can you
 6        describe what count two damages are in this case?
 7    A   My understanding is that Plaintiff's theory is that
 8        USAA should have been limited to charging only the
 9        expenses that were stated in the policy based on the
10        contractual language.  I believe in the first year
11        there was an administrative charge, and then in all
12        years including first year, there was a maintenance
13        charge.
14                  My understanding is that the calculation
15        that I have performed here takes the viewpoint that
16        any charge in the COI rate that's above and beyond
17        the expected mortality is viewed as an expense, and
18        as such the count two damages would be identical to
19        count one.
20    Q   Is -- do you consider profit to be an expense?
21    A   It could be from the policyholder's viewpoint.
22    Q   Is it?  That doesn't sound natural to me.  Does that
23        sound right to you?
24              MR. LYTLE:  Object to the form.
25    BY MR. MATTSON:

1      right?
2              MR. LYTLE:  Object to the form.
3              THE WITNESS:  Yes.
4    BY MR. MATTSON:
5    Q    Another thing that USAA Life considered in setting
6         those cost of insurance rates was expenses, right?
7              MR. LYTLE:  Same objection.
8              THE WITNESS:  I believe so.
9    BY MR. MATTSON:
10   Q    Another thing they considered was profit, right?
11             MR. LYTLE:  Same objection.
12             THE WITNESS:  I really did not review the
13        documents in that it's outside the scope of what I
14        was asked to do.  So I have a passing familiarity
15        with them by looking at them, but I -- I'm not an
16        expert on what USAA did and didn't do in the pricing
17        exercise.
18   BY MR. MATTSON:
19   Q    I understand that.  But one of the things that they
20        considered was profit, correct?
21             MR. LYTLE:  Object to the form.
22             THE WITNESS:  I believe I saw reference to
23        that.
24   BY MR. MATTSON:
25   Q    And there's nothing -- as somebody who's worked on

 1      of any reason why there would be any count three
 2      damages prior to 2005.  That would all be
 3      encapsulated in the count one damages.
 4   BY MR. MATTSON:
 5   Q  Okay.  And then what you do is look at from 2005 on
 6      what evidence there is at USAA Life about changes in
 7      mortality expectations?
 8   A  Yes.
 9   Q  Can we look anywhere in Exhibit 1, including its
10      exhibits, and find which documents, which USAA Life
11      documents you would be relying on to perform that
12      calculation?
13             MR. LYTLE:  Object to the form.
14             THE WITNESS:  I believe they're listed in
15      there.  I would be hard pressed to point to them on
16      the fly.  I mean I can -- I can get there by
17      following the trail in my report.  But I can't off
18      the top of my head tell you which exhibit or what
19      Bates number they are.
20   BY MR. MATTSON:
21   Q  In other words there's nothing in Exhibit 1 that says
22      separately, here are the documents I would look at
23      for count three in performing the calculations that
24      you've just been describing these last several
25      minutes?

 1                MR. LYTLE:  Object to the form.
 2                THE WITNESS:  I guess I view it as two
 3      distinct -- two distinct issues.  There's the model
 4      and understanding how the model works and how the
 5      count three formula is distinct from the count one.
 6      And then a separate question is what mortality
 7      assumptions do you put into the model in calculating
 8      those count three damages.  I don't know which you're
 9      asking me.
10   BY MR. MATTSON:
11   Q   I'm asking you about the second one.  And really to
12      try to state it more plainly, can you point me in
13      Exhibit 1 to where I would see the mortality
14      expectations you would -- you would plug into your
15      count three analysis?
16   A  Okay, I'm -- I -- in paragraph 73 I describe how for
17      Mr. Spegele's 28th policy year I'm comparing the
18      mortality that was assumed in 2005 when the repricing
19      was done with the expected mortality using the 2017
20      mortality assumption.
21                So my recollection is that the 2017
22      mortality assumption came from a USAA-supplied
23      document that had a mortality study.  And there were
24      other such studies in the intervening years between
25      1995 -- I'm sorry, between -- strike that -- between

1       2005 and 2017.
2               I made no effort at this time to -- to go
3       beyond what I just did here.  And I looked at the
4       most recent.  Seemed clear that there had been
5       substantial mortality improvement.  I'll leave it at
6       that.
7    Q  So I think I understand.  In paragraph 73 of
8       Exhibit 1 you refer to the 2017 mortality
9       assumptions, right?
10   A  Yes.
11   Q  But I wouldn't find in Exhibit 1, and here's my list
12      of pre 2017, post 2005 mortality assumptions that I
13      would rely on in conducting this count three
14      analysis; is that fair?
15   A  I believe that they are listed in the litany of
16      documents that were reviewed and provided, but I
17      don't have -- I don't have a written, you know, step
18      by step these are the mortality studies that I'm
19      going to look at.
20   Q  Right.
21   A  In my mind everything is fair game that USAA has
22      provided related to this case, related to expected
23      mortality assumptions between the time period 2005
24      and 2017.
25   Q  And I think we're on the same page, but let me just

1      be sure.  There's nothing in Exhibit 1 that calls --
2      specifically calls out which documents you would look
3      at for that 2005 to 2017 time frame, which documents
4      would inform your understanding of the then-current
5      mortality expectations?
6   A  I think that's fair to say.  If I am charged to do
7      so, I will look at all of those documents and -- and
8      this is where some actuarial judgment may come in --
9      and formulate an appropriate assumption.
10              MR. MATTSON:  Okay.  Let's take a short
11     break.
12              THE VIDEOGRAPHER:  We're going off the
13     record at 11:24 a.m.  This will be the end of media
14     unit number two.
15              (Recess taken from 11:24 to 11:37 a.m.)
16              THE VIDEOGRAPHER:  We're back on record at
17     11:37 a.m.  This will be the beginning of media unit
18     number three.
19  BY MR. MATTSON:
20  Q  Mr. Witt, when you were at Northwestern Mutual, did
21     you ever work on a policy that was designed to lose
22     money from day one and never make money?
23  A  No.
24  Q  Would doing that be permissible under the actuarial
25     standards of practice?

```
 1     STATE OF WISCONSIN  )
                          ) SS:
 2     MILWAUKEE COUNTY    )

 3

 4                I, Tammy R. O'Neal, RPR and Notary

 5     Public in and for the State of Wisconsin, do hereby

 6     certify that the preceding deposition was recorded by

 7     me and reduced to writing under my personal

 8     direction.

 9                I further certify that said deposition was

10     taken at Gass Weber Mullins LLC, 241 North Broadway,

11     Milwaukee, Wisconsin, on the 30th day of January,

12     2020, commencing at 9:08 a.m. and concluding at 1:56

13     p.m.

14                I further certify that I am not a relative

15     or employee or attorney or counsel of any of the

16     parties, or a relative or employee of such attorney

17     or counsel, or financially interested directly or

18     indirectly in this action.

19                In witness whereof, I have hereunto set my

20     hand and affixed my seal of office on this 3rd day of

21     February, 2020.

22
                              _____
23                              TAMMY R. O'NEAL, RPR
24                              Notary Public

25     My commission expires 8/2/23.
```